**Reversed and Rendered and Opinion Filed March 19, 2024**



In The

**Court of Appeals**
**Fifth District of Texas at Dallas**

**No. 05-22-00878-CV**

**IN RE THE STATE OF TEXAS FOR THE BEST INTEREST**
**AND PROTECTION OF J.M.P. JR.**

**On Appeal from the Probate Court No. 3**
**Dallas County, Texas**
**Trial Court Cause No. MI-92-1623**

**OPINION**

Before Justices Partida-Kipness, Reichek, and Miskel
Opinion by Justice Miskel

J.M.P. Jr. appeals the trial court's order denying his petition to remove his firearms disability and restore his right to purchase and possess firearms. The Dallas County District Attorney's Office represented the State in opposing J.M.P. Jr.'s petition.

J.M.P. Jr. is a prospective gun purchaser who, thirty years ago, before his senior year of high school, was involuntarily committed to a mental health facility for a week to ten days. Since that time, J.M.P. Jr. has been stable, married for over fourteen years with three children, industrious in business, and involved in his

church and multiple local charities.  J.M.P. Jr. learned of his firearms disability when he attempted to purchase a hunting rifle.  As a result, he filed a petition seeking relief from his firearms disability and restoration of his right to purchase and possess firearms under Texas Mental Health Code (TMHC)[1] § 574.088.  *See* TEX. HEALTH & SAFETY CODE ANN. §§ 571.001, 574.088.  The State opposed his petition.

On appeal, J.M.P. Jr. raises two issues arguing that: (1)(a) the trial court abused its discretion by denying his petition, and (b) the federal and state relief-from-disabilities statutes are unconstitutional as applied; and (2) the trial court erred when it failed to make findings of fact and conclusions of law.

We conclude the trial court abused its discretion by denying J.M.P. Jr.'s petition to remove his firearms disability, because J.M.P. Jr. conclusively established every element required to show that he was entitled to relief under § 574.088 of the TMHC.  We reverse the trial court's order and render an order that: (1) states that J.M.P. Jr. qualifies for relief from a firearms disability; (2) declares that J.M.P. Jr. is not a prohibited person under 18 U.S.C. § 922(g)(4); and (3) restores J.M.P. Jr.'s right to ship, transport, possess, or receive firearms and ammunition.

We publish this opinion because this case involves issues of first impression.  *See* TEX. R. APP. P. 47.4.  Relief from a firearms disability involves the intersection

---

[1] The THMC is Title 7, Subtitle C of the Texas Health and Safety Code, encompassing Chapters 571–79 of that Code.

of federal and state laws and raises issues of first impression in this Court as well as the State of Texas with respect to the proper application of § 574.088 of the TMHC and related federal statutes.

## I. Factual and Procedural Background

The following facts are based on the pleadings and the evidence adduced at the hearing on J.M.P. Jr.'s petition.[2]

### A. The 1992 Commitment

J.M.P. Jr. had always excelled in school and sports, but around age seventeen in his junior year of high school, his personality changed. He started failing classes and lost interest in things. J.M.P. Jr. went to outpatient counseling, but it did not resolve his issues. In one incident where J.M.P. Jr. was not getting along with his parents, he ran away from home and went to stay with a friend a mile away for a few days. J.M.P. Jr. would not talk to his father about what had changed and would not agree to a mental health evaluation. J.M.P. Sr. believed that J.M.P. Jr. needed to be evaluated, and he was advised to obtain a court-ordered evaluation.

On August 12, 1992, J.M.P. Sr. completed an application to have J.M.P. Jr. temporarily committed.[3] The form came preprinted with allegations that the subject

---

[2] The record in this case was filed under seal. We must hand down a public opinion explaining our decisions based on the record, which we cannot do without mentioning certain specific facts. *Kartsotis v. Bloch*, 503 S.W.3d 506, 510 (Tex. App.—Dallas 2016, pet. denied) (citing TEX. R. APP. P. 47.1, 47.3, and TEX. GOV'T CODE ANN. § 552.022(a)(12). We have nonetheless strived to preserve the confidentiality of the materials by avoiding discussion of details where possible and making some portions deliberately vague. *See id.*

[3] None of the documents relating to the 1992 commitment were admitted into evidence at the 2022 hearing that is the basis of this appeal. We summarize the facts for narrative clarity only.

of the form—J.M.P. Jr.—was mentally ill and that as a result of mental illness, either (1) was likely to cause serious harm to himself or others, or (2) would continue to suffer severe and abnormal mental, emotional, or physical distress and would continue to experience deterioration of his ability to function independently. It also included a preprinted request that J.M.P. Jr. be examined by two physicians. The certificate stated that J.M.P. Jr. had been diagnosed with major depressive disorder, his condition was deteriorating in outpatient treatment, he needed an intensive inpatient evaluation, and he was likely to cause harm to himself, but not likely to cause serious harm to others. The State also filed a motion seeking an order of protective custody. A physician's certificate of medical examination dated August 11, 1992, was attached in support of the State's motion.

On August 17, 1992, a second physician from the public mental health facility submitted a certificate of medical examination. After evaluating J.M.P. Jr., both physicians concluded that he was angry, defiant, and depressed, and he was a danger to himself but not to others. They also diagnosed J.M.P. Jr. with "major depressive disorder." However, neither of the examining physicians concluded that J.M.P. Jr.'s condition was expected to continue for more than 90 days.

On August 20, 1992, after a non-jury hearing, the trial judge signed a judgment for court-ordered in-patient mental health services. The trial court found that J.M.P. Jr. was mentally ill and likely to cause harm to himself but not to others and, if not treated, he would continue to suffer and experience deterioration of his

ability to function independently. However, the trial court also found that J.M.P. Jr. was able to make a rational and informed decision as to whether to submit to treatment. The trial court ordered that J.M.P. Jr. receive temporary in-patient mental health services for a period not to exceed 90 days.

J.M.P. Jr. was hospitalized for a week to ten days. At the 2022 hearing, J.M.P. Jr. testified that he did not recall having been placed on any medication during his 1992 hospitalization, and the physicians' certificates do not reflect that he was prescribed medication. It is undisputed that J.M.P. Jr. was completely discharged from court-ordered mental health treatment in 1992 and that there was no recommendation or requirement that he continue to receive mental health treatment.

## B. History Between 1992–2022

Soon after his discharge, J.M.P. Jr. began and completed his senior year of high school without incident. He attended university and, after graduating, worked for a real estate developer for nine years. At some point, he changed companies and was eventually promoted to chief operating officer (COO) and was made part owner. Later, the board of directors promoted him to president and chief executive officer (CEO). In approximately 2020, he purchased the other owners' interest in the company and became the sole owner of the business. He currently employs approximately forty-five people.

J.M.P. Jr. prospered in his personal life as well. He has been married for over fourteen years, has three children, and has been involved in extended family life with

his father, his siblings, and their children. He has volunteered with his church and multiple charities, and he coached his children's youth sports teams.

In 2021, approximately thirty years after he was involuntarily committed, J.M.P. Jr. attempted to purchase a hunting rifle, in part to hunt wild hogs on his ranch, but he was denied. He investigated the reason for his denial and learned from the Federal Bureau of Investigation that he matched a prohibiting record under 18 U.S.C. § 922(g)(4) as a person who was adjudicated mentally defective or who had been committed to a mental institution and was therefore prohibited from possessing a firearm or ammunition. In compliance with the law, J.M.P. Jr gave his firearms—a Beretta twin-gauge semiautomatic shotgun for duck and quail hunting, a 12-gauge Remington 1100 shotgun for duck and turkey hunting, and a 243-caliber Ruger M-77 rifle for deer hunting—back to J.M.P. Sr. who had purchased them for J.M.P. Jr. when he was fifteen years old. J.M.P. Jr. had passed a hunter safety class when he was in his twenties and had been hunting for a major part of his life—he owns hunting dogs, it was a big part of his social relationships, and he wanted to teach his son.

## C. The 2022 Petition for Relief from Firearms Disability

In 2022, J.M.P. Jr. filed a petition with the probate court that had entered the original involuntary commitment order to lift his firearms disability and restore his right to purchase and possess firearms. The State filed an answer requesting that the trial court deny J.M.P. Jr.'s claim for relief from his firearms disability.

During the hearing, the trial court heard testimony from J.M.P. Sr., a licensed professional counselor, and J.M.P. Jr. The trial court admitted two letters from friends of J.M.P. Jr. attesting to his good reputation. The evidence admitted showed that following his involuntary commitment, J.M.P. Jr. has been an upstanding citizen; his mental health and criminal history has been spotless for thirty years; and his father and two friends attested to his sterling reputation, good character, and positive involvement in family, business, and community affairs. The State offered no exhibits and called no witnesses during the trial. Instead, the State asked the trial court to take judicial notice of the documents associated with the 1992 involuntary commitment, including the application form completed by J.M.P. Sr. and the certificates of mental health examination. The trial court took judicial notice of the documents but did not admit them into evidence. The State cross-examined witnesses with quotations from these documents and their allegations that J.M.P. Jr. ran away from home and had problems with his siblings and parents as a youth.

After hearing the evidence, the trial judge denied J.M.P. Jr.'s petition and explained her reasons for doing so. The trial judge stated that the 1992 involuntary-commitment documents, which were not in evidence, led her to believe that J.M.P. Jr. was unable at that time to make rational decisions due to depression.[4]

---

[4] This contradicts an express finding in the 1992 order that J.M.P. Jr. was able to make a rational and informed decision about his treatment.

Then, based on no evidence within the record, the trial judge further expressed her personal belief that no one can ever recover from a mental health condition:[5]

| Trial Judge: | I have done mental health for a long time, over 20 years, and I have never heard of someone being healed of a mental illness. Never. |
| J.M.P. Jr.'s Counsel: | I'm sorry? |
| Trial Judge: | I said I have never heard of anyone being healed of a mental illness. It is treatable, but to be cured of it and then not to receive treatment afterwards, I don't understand how that happened when someone is having a depression. |

On the same day as the hearing, the trial judge also signed an order denying J.M.P. Jr.'s petition as follows:

> [J.M.P. Jr.'s] Petition should be denied as removal of the firearms disability is not in the public interest.
>
> It is therefore **ORDERED, ADJUDGED AND DECREED** that the Petition for Relief from Firearms Disability filed by [J.M.P. Jr.] is hereby DENIED.
>
> **IT IS FURTHER ORDERED THAT PURSUANT TO 18 U.S.C. 922(g)(4), [J.M.P. Jr.] IS NO LONGER ELIGIBLE TO PURCHASE OR POSSESS A FIREARM OR AMMUNITION.**

The trial court's order does not state that J.M.P. Jr.'s petition should be denied on the basis that he is likely to act in a manner dangerous to public safety.

---

[5] Our system of justice does not allow courts to make decisions based solely on the personal opinions of a judicial officer, entirely unsupported by evidence. "[C]itizens should be governed by clear laws consistently applied, not personal whims." *In re State*, 489 S.W.3d 454, 454 (Tex. 2016) (orig. proceeding). The integrity of our constitutional system of government relies on society believing that bedrock principles are founded in the law rather than in the proclivities of individuals. *See Vasquez v. Hillary*, 474 U.S. 254, 265 (1986). We are a government of laws, not of men. *See Phillips v. McNeill*, 635 S.W.3d 620, 628 (Tex. 2021); *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 163 (1803).

J.M.P. Jr. timely requested findings of fact and conclusions of law and timely filed a notice of past due findings and conclusions to which the trial court did not respond. *See* TEX. R. CIV. P. 297. He also filed a motion for new trial, which the trial court denied by written order without a hearing on August 2, 2022.[6]

## II. It Was an Abuse of Discretion to Deny the Petition for Relief from a Firearms Disability

In the first part of issue one, J.M.P. Jr. argues the trial court abused its discretion when it denied his petition to remove his firearms disability. He makes three arguments in support of his contention: (1) under federal statutory law, which has been incorporated into § 574.088(a) of the TMHC, he is no longer disqualified from possessing or purchasing a firearm; (2) under a legal sufficiency standard of review, the undisputed evidence establishes, as a matter of law, all vital facts in support of his petition; and (3) under a factual sufficiency standard, trial court's adverse finding is against the great weight and preponderance of the evidence.

The State responds that it does not dispute much of the evidence submitted by J.M.P. Jr. concerning what occurred in his life after his involuntary civil commitment. The State argues that the trial court did not abuse its discretion because

---

[6] Attached to his motion for new trial was a letter from a psychiatrist that appears to have been an attempt to respond to the personal beliefs announced by the trial judge when rendering her decision. The letter was from a psychiatrist who evaluated J.M.P. Jr. after the trial judge's comments, concluding that J.M.P. Jr. "has good insight, is well-adjusted, and displays no impairment due to any mental health issues." The psychiatrist also stated in part that "it is not uncommon for a person who may have had mental health issues as a teenager to recover from or mature out of such issues as an adult." However, that letter was not admitted into evidence during the trial, and there was no hearing on J.M.P. Jr.'s motion for new trial.

J.M.P. Jr. failed to establish by clear and convincing evidence[7] that the removal of his firearms disability is in the public interest; he admitted only evidence of his personal reasons for wanting his firearms disability removed. Also, the State maintains that J.M.P. Jr.'s contested evidence was inconsistent and not credible.

## A. Standard of Review

The general test for abuse of discretion is whether the trial court acted without regard to any guiding rules or principles. *See Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004). This occurs when either: (1) the trial court fails to analyze or apply the law correctly; or (2) with regard to factual issues or matters committed to its discretion, the trial court could reasonably reach only one decision and failed to do so. *See VSDH Vaquero Venture, Ltd. v. Gross*, No. 05-19-00217-CV, 2020 WL 3248481, at *4 (Tex. App.—Dallas June 16, 2020, no pet.) (mem. op.). Another way of stating the test is whether the act was arbitrary or unreasonable. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 242 (Tex. 1985). Under an abuse of discretion standard, an appellate court defers to the trial court's factual determinations if they are supported by evidence, but it reviews the trial court's legal determinations de novo. *Stockton v. Offenbach*, 336 S.W.3d 610, 615 (Tex. 2011).

---

[7] The statute does not impose a clear and convincing evidentiary standard. "Only in extraordinary circumstances, such as when we have been mandated to impose a more onerous burden, has this Court abandoned the well established preponderance of the evidence standard." *Ellis Cnty. State Bank v. Keever*, 888 S.W.2d 790, 792 (Tex. 1994). The State has not supported its proposed heightened evidentiary standard with analysis or with citations to authority.

Under an abuse of discretion standard of review, legal and factual sufficiency claims are not independent, reversible grounds of error, but rather merely factors to consider in assessing whether the trial court abused its discretion. *See Beaumont Bank, N.A. v. Buller*, 806 S.W.2d 223, 226 (Tex. 1991); *IKB Indus. Ltd. v. Pro-Line Corp.*, 938 S.W.2d 440, 445 (Tex. 1997) (Baker, J., dissenting); *Tex. Dep't of Pub. Safety v. Randolph*, No. 02-13-00025-CV, 2014 WL 1875826, at *2 (Tex. App.—Fort Worth May 8, 2014, pet. denied) (mem. op. on reh'g) (concluding evidence was sufficient to establish applicant was not disqualified under federal law from purchasing handgun based on mental health adjudication). For both legal and factual sufficiency challenges, an appellate court ordinarily defers to the fact-finder's determination regarding the witnesses' credibility and the weight accorded their testimony. *See City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005) (legal sufficiency); *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003) (factual sufficiency). If there are conflicts in the testimony, an appellate court must presume the fact-finder resolved them in favor of the ruling if reasonable human beings could do so. *See Jackson v. Axelrad*, 221 S.W.3d 650, 653 (Tex. 2007) (citing *City of Keller*, 168 S.W.3d at 819). Of course, the fact-finder's decisions regarding credibility must be reasonable. *City of Keller*, 168 S.W.3d at 820. A fact-finder cannot ignore undisputed testimony that is clear, positive, direct, otherwise credible, free from contradictions and inconsistencies, and could have been readily

–11–

controverted, and a fact-finder is not free to believe testimony that is conclusively negated by undisputed facts. *Id*.

When a party attacks the legal sufficiency of an adverse finding on which it had the burden of proof, it must demonstrate on appeal that the evidence conclusively establishes, as a matter of law, all vital facts in support of the issue. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001) (per curiam). An appellate court conducting a legal sufficiency review cannot disregard undisputed evidence that allows only one logical inference. *City of Keller*, 168 S.W.3d at 814. The fact-finder is not free to reach a verdict contrary to such evidence. *Id*. The reviewing court must otherwise assume the fact-finder resolved disputed facts in favor of the finding. *See In re A.C.*, 560 S.W.3d 624, 630–31 (Tex. 2018). In reviewing a "matter of law" challenge, the reviewing court must first examine the record for evidence that supports the finding, while ignoring all evidence to the contrary. *See Dow Chem.*, 46 S.W.3d at 241. If there is no evidence to support the finding, the reviewing court will then examine the entire record to determine if the contrary proposition is established as a matter of law. *Id*. The issue should be sustained only if the contrary proposition is conclusively established. *Id.*

When there are no findings of fact despite a timely request, an appellate court presumes that a trial court made all the findings necessary to support its judgment. *See Ad Villarai, LLC v. Chan Il Pak*, 519 S.W.3d 132, 135 (Tex. 2017). A party may

rebut this presumption by demonstrating that the record evidence does not support a presumed finding. *Id*.

## B. Applicable Law

The State has not identified any basis under Texas state law for imposing a firearms disability on J.M.P. Jr. The pleadings, the trial court's order, Texas law,[8] and the briefing all point to federal law 18 U.S.C. § 922(g)(4) as being the sole source of J.M.P. Jr.'s firearms disability.

The law relating to relief from a federal firearms disability involves the intersection of federal and state laws, including:

(1) 18 U.S.C. § 922(g)(4) (firearms—unlawful acts);

(2) 34 U.S.C. § 40911(c)(2)(B) (enhancement of requirement that federal departments and agencies provide relevant information to national instant criminal background check system);

(3) 34 U.S.C. § 40913 (implementation assistance to the states);

(4) 34 U.S.C. § 40915 (relief from disabilities program required as condition for participation in grant programs);

(5) TEX. CONST. art. 1, § 15-a (commitment of persons of unsound mind); and

(6) TMHC § 574.088 (relief from disabilities in mental health cases).

## 1. Texas Law Relating to Mental Health Commitments

A mental-health facility's authority to detain a patient against his will is subject to constitutional limitations. *Loya v. Hickory Trail Hosp., L.P.*, 673 S.W.3d

---

[8] *See* HEALTH & SAFETY § 574.088(b)(1).

1, 12 (Tex. App.—Dallas 2022, no pet.). Each person in Texas has a federal and state constitutional right not to be involuntarily committed except upon sufficient evidence. *Id.*; TEX. CONST. art. I, § 15-a ("No person shall be committed as a person of unsound mind except on competent medical or psychiatric testimony."). To safeguard these rights while also ensuring that those with severe mental illness have access to humane care, the legislature enacted the TMHC. *Loya*, 673 S.W.3d at 12; HEALTH & SAFETY § 571.002 (stating purpose of TMHC).

The facility administrator of a facility to which a patient was committed or from which a patient was required to receive temporary or extended inpatient or outpatient mental health services shall discharge the patient when the court order expires. HEALTH & SAFETY § 574.085. However, under § 574.086 of the TMHC, a patient committed for court-ordered mental health services may be discharged at any time before the expiration of the court order if the "facility administrator or person determines that the patient no longer meets the criteria for court-ordered mental health services" and such a discharge terminates the court order and the discharged person may not be required to submit to further involuntary mental health services unless a new court order is entered. *Id.* § 574.086(a), (c); *Randolph*, 2014 WL 1875826, at *5. The facility administrator of a facility to which the patient was involuntarily committed for inpatient mental health services shall consider before discharging the patient whether the patient should receive outpatient court-ordered mental health services in accordance with: (1) a furlough under § 574.082 or (2) a

–14–

modified order under § 574.061 that directs the patient to participate in outpatient mental health services. HEALTH & SAFETY § 574.086(b). The facility administrator or the person responsible for outpatient care who discharges a patient shall prepare a discharge certificate and file it with the court that entered the order requiring mental health services. *Id.* § 574.087.

## 2. Federal Law Imposing Firearms Disability

The duties pertaining to the sale of a firearm are regulated by the Gun Control Act of 1968, as amended by the Brady Handgun Violence Prevention Act of 1993 ("Brady Act"). *See* 18 U.S.C. §§ 921–34; *Reyna v. Academy Ltd.*, No. 01-15-00988-CV, 2017 WL 3483217, at *5 (Tex. App.—Houston [1st Dist.] Aug. 16, 2017, no pet.) (mem. op.). Before a federally licensed firearms dealer may sell a firearm, the would-be purchaser must provide certain personal information, show photo identification, and pass a background check. *Reyna*, 2017 WL 3483217, at *5. Pursuant to 18 U.S.C. § 922(g)(4), certain classes of people, including the mentally ill, are disqualified from purchasing or possessing firearms. 18 U.S.C. § 922(g)(4); *Reyna*, 2017 WL 3483217, at *5; *accord Abramski v. United States*, 573 U.S. 169, 172 (2014). Section 922(g)(4) states as follows:

> It shall be unlawful for any person who has been adjudicated as a mental defective or who has been committed to a mental institution to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

18 U.S.C. § 922(g)(4).

"Committed to a mental institution" means "a formal commitment to a mental institution by a court, board, commission, or other lawful authority." 27 C.F.R. § 478.11. The term includes commitment to a mental institution involuntarily, but it does not include a person in a mental institution for observation or a voluntary admission to a mental institution. *Id*.

### 3. Relief from Federal Firearms Disability

However, federal law also includes a process through which individuals who have been involuntarily committed can restore their rights under the National Instant Criminal Background Check System Improvement Amendments Act (NIAA). 34 U.S.C. § 40911. The NIAA specifically cross-references 18 U.S.C. § 922(g)(4) and:

(1) requires federal agencies that impose mental health adjudications or involuntary commitments to provide a process for relief from the disabilities described in 18 U.S.C. § 922(g)(4), and

(2) provides grant money to states that implement a disability relief program under 34 U.S.C. § 40915.

34 U.S.C. §§ 40911(c)(2), 40913(c); *see also Randolph*, 2014 WL 1875826, at *3 (noting Congress passed amendment that allows states to establish their own programs to provide relief from firearm disabilities).

## 4. Texas State Law for Relief from Federal Firearms Disability

Texas has further adopted a state program to provide relief from federal firearms disabilities. The program Texas adopted appears in § 574.088 of the TMHC. *Randolph*, 2014 WL 1875826, at *3. That section provides as follows:

(a) A person who is furloughed or discharged from court-ordered mental health services may petition the court that entered the commitment order for an order stating that the person qualifies for relief from a firearms disability.

(b) In determining whether to grant relief, the court must hear and consider evidence about:

(1) the circumstances that led to imposition of the firearms disability under 18 U.S.C. § 922(g)(4);

(2) the person's mental history;

(3) the person's criminal history; and

(4) the person's reputation.

(c) A court may not grant relief unless it makes and enters in the record the following affirmative findings:

(1) the person is no longer likely to act in a manner dangerous to public safety; and

(2) removing the person's disability to purchase a firearm is in the public interest.

HEALTH & SAFETY § 574.088.

## C. J.M.P. Jr. Conclusively Established All Vital Facts in Support of His Petition

J.M.P. Jr. argues that the trial court abused its discretion because (1) under a legal sufficiency standard of review, the undisputed evidence establishes, as a matter of law, all vital facts in support of his petition, and alternatively (2) under a factual

sufficiency standard, the trial court's adverse finding is against the great weight and preponderance of the evidence. Here, J.M.P. Jr. had the burden of proof on his petition to remove his firearms disability and restore his right to purchase and possess firearms.

## 1. Lack of Evidence to Support the Trial Court's Findings

We begin with J.M.P. Jr.'s legal sufficiency challenge by examining the record for evidence that supports the trial court's implied findings, while ignoring all evidence to the contrary. *See Dow Chem.*, 46 S.W.3d at 241.

In adjudicating a petition under § 574.088 of the TMHC, the trial court must hear and consider the evidence described by (b)(1)–(4). HEALTH & SAFETY § 574.088. Then, to grant relief under the statute, the trial court must make two statutory findings: (c)(1) the person is no longer likely to act in a manner dangerous to public safety; and (c)(2) removing the person's disability to purchase a firearm is in the public interest. *Id*. In denying J.M.P. Jr.'s petition, the trial court did not make any findings relating to the evidence presented pursuant to (b)(1)–(4) and did not find that J.M.P. Jr. is likely to act in a manner dangerous to public safety, but it expressly found that "[J.M.P. Jr.'s] Petition should be denied as removal of the firearms disability is not in the public interest."

During the trial, the State offered no evidence and called no witnesses. The State did request, and the trial court agreed to take, judicial notice of the documents associated with the 1992 involuntary commitment, including the application form

filled out by J.M.P. Sr. and the certificates of mental health examination.[9]  A court may take judicial notice that pleadings have been filed.  *See Gruber v. CACV of Colo., LLC*, No. 05-07-00379-CV, 2008 WL 867459, at *2 (Tex. App.—Dallas Apr. 2, 2008, no pet.) (mem. op.).  But the trial court may not take judicial notice of the truth of factual statements and allegations contained in the pleadings, affidavits, or other documents in the file, nor may it take the pleadings to be true, absent testimony, other proof, or admissions by the other party.  *See O'Donnell v. Vargo*, No. 05-14-00404-CV, 2015 WL 4722459, at *4 (Tex. App.—Dallas Aug. 10, 2015, no pet.) (mem. op.); *Gruber*, 2008 WL 867459, at *2.  The court taking judicial notice of the contents of its file does not elevate those averments into proof.  *See Gruber*, 2008 WL 867459, at *2 (citing two cases which held that judicial notice of pleadings was legally insufficient evidence to support an element of a claim).  Generally, pleadings and affidavits filed with the court cannot be considered as evidence unless they are admitted into evidence.  *Tex. Health Res. v. Pham*, No. 05-15-01283-CV, 2016 WL 4205732, at *7 (Tex. App.—Dallas Aug. 3, 2016, no pet.) (mem. op.).  And documents attached to pleadings are not evidence.  *Gruber*, 2008 WL 867459, at *2.

---

[9]  Under Texas Rule of Evidence 201, if a fact is not subject to reasonable dispute because it (1) is generally known within the trial court's territorial jurisdiction, or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned, then a court may take judicial notice of it.  TEX. R. EVID. 201(b).

On appeal, the State "does not dispute much of the evidence submitted by [J.M.P. Jr.] concerning what occurred in his life after the civil commitment" and agrees that the following specific facts are not in dispute:

- J.M.P. Sr. applied to have his son involuntarily committed for treatment of mental illness when J.M.P. Jr. was seventeen years of age.

- On August 20, 1992, J.M.P. Jr. was civilly, involuntarily committed for a period not to exceed 90 days.

- J.M.P. Jr was unable to purchase a rifle because of a firearms disability due to his involuntary commitment in 1992 for mental illness.

- On March 31, 2022, J.M.P. Jr filed a petition pursuant to § 574.088 of the TMHC seeking to have his firearms disability removed.

- On June 16, 2022, the trial court held a hearing on J.M.P. Jr.'s petition for relief from his firearms disability and signed an order denying the petition on the same day.

- There was no evidence of J.M.P. Jr. receiving any mental illness treatment subsequent to his release from his involuntary commitment in 1992.

- There was no evidence that J.M.P. Jr. has a criminal history.

- The only reputation evidence admitted during the hearing were the two character letters offered by J.M.P. Jr.

The State has expressly conceded a lack of controverting evidence against J.M.P. Jr. with respect to § 574.088(b)(2)–(4) of the TMHC. The record further contains no evidence to support the trial court's express finding that removing J.M.P. Jr.'s disability to purchase a firearm is not in the public interest. *See* HEALTH & SAFETY § 574.088(c)(2).

–20–

## 2. Review of Entire Record to Determine if Contrary Proposition Was Established as a Matter of Law

Next, because there is no evidence to support the trial court's finding, we examine the entire record to determine if the contrary proposition is established as a matter of law. *See Dow Chem.*, 46 S.W.3d at 241. In determining whether to grant J.M.P. Jr. relief, the trial court was required to hear and consider evidence about the following:

(1)  the circumstances that led to the imposition of J.M.P. Jr.'s firearms disability under 18 U.S.C. § 922(g)(4);

(2)  J.M.P. Jr.'s mental history;

(3)  J.M.P. Jr.'s criminal history; and

(4)  J.M.P. Jr.'s reputation.

*See* HEALTH & SAFETY § 574.088(b).

First, we review the evidence regarding the circumstances that led to the imposition of J.M.P. Jr.'s firearms disability under 18 U.S.C. § 922(g)(4). *See* HEALTH & SAFETY § 574.088(b)(1). The evidence established that the initial, limited commitment when J.M.P. Jr. was a teenager resulted from a behavioral aberration. The 1992 trial court found that J.M.P. Jr. was mentally ill and likely to cause harm to himself but not to others and, if not treated, he would continue to suffer and experience deterioration of his ability to function independently. J.M.P. Jr. testified that he did not recall being prescribed any medication for a mental-health condition

while he was involuntarily committed.[10]   J.M.P. Sr. testified that neither he nor anyone at the hospital had observed anything to suggest his son had violent tendencies.  Rather, according to J.M.P. Sr., the allegation in his 1992 application that J.M.P. Jr. was likely to harm himself or others was simply part of the form's preprinted, boilerplate language, and he had signed it only in order to force his son to undergo an evaluation.  J.M.P Sr. was cross-examined by the State about some of the statements made in the two examining physicians' reports from 1992, the accuracy of which J.M.P. Sr. disputed.  One of the examining physicians had reported that J.M.P. Jr. had hit his siblings when he was angry, but the report also stated he was not likely to harm others, and J.M.P. Sr. testified that he has never seen J.M.P. Jr. hit anyone in anger or abuse his siblings.  While both of the 1992 examining physicians reported that J.M.P. Jr. was continuing to deteriorate despite intensive outpatient therapy, J.M.P. Sr. testified that he had no recollection of J.M.P. Jr. ever receiving intensive outpatient treatment.

Second, we review the evidence related to J.M.P. Jr.'s mental history.  *See* HEALTH & SAFETY § 574.088(b)(2).  The evidence admitted showed that during the thirty years following his involuntary commitment, J.M.P. Jr. has not been treated for mental health issues.  J.M.P. Jr. testified that it was not recommended he continue nor did he receive mental health treatment or medication for a mental health

---

[10] Nothing in the record controverted this testimony, even including the older commitment records that were judicially noticed but not admitted into evidence.

condition after he was discharged. And nothing in the record indicates further treatment was recommended. *See, e.g.*, HEALTH & SAFETY § 574.081. J.M.P. Sr. stated that his son did not receive any mental health treatment after he was discharged. J.M.P. Sr. also testified that he had no concern that J.M.P. Jr. posed a danger to anyone due to his decades-long track record of safety and stability.

Further, the licensed professional counselor who evaluated J.M.P. Jr. testified that she concluded there were no indications of mental instability, nor were there any mental health concerns reported or identified that should prevent J.M.P. Jr. from owning a firearm.[11] J.M.P. Jr. told the licensed professional counselor that, to his knowledge, he was not diagnosed with or prescribed medication for a mental health concern when he was temporarily committed as a teenager. Since that time, he has not been diagnosed or treated for any type of mental health issues or prescribed any medication for any mental health concerns. The licensed professional counselor described J.M.P. Jr. as "high functioning and accomplished." She stated there are no indications of addictive behaviors, he has no learning differences, and he is not experiencing extraordinary stress or crisis; there are no physical health issues that might affect his mental health.

---

[11] Although the State did not object to the licensed professional counselor's testimony or the admission of her report into evidence, the trial judge sua sponte concluded that "[the licensed professional counselor] was not qualified as an expert in evaluations for psychiatric purposes, and the Best Evidence Rule requires us to look at the whole circumstance surrounding this." As a result, the trial judge stated that she was looking at only what J.M.P. Sr. attested to and what the physicians wrote in their reports in 1992.

–23–

In addition, the State did not dispute at trial that that there was no continuing care plan and that J.M.P. Jr. had not had any mental health treatment in the thirty years since his temporary, involuntary commitment in 1992. And, on appeal, the State concedes there was no evidence of J.M.P. Jr. receiving any mental health treatment after his release from his involuntary commitment in 1992.

Third, we consider the evidence related to J.M.P. Jr.'s criminal history. *See* HEALTH & SAFETY § 574.088(b)(3). During the hearing, the assistant district attorney acknowledged that he had "reviewed a clear report from [J.M.P. Jr.]'s attorney that shows [he] did not have any arrests or criminal history" and J.M.P. Jr. confirmed that was correct. At the conclusion of the hearing, the trial judge also noted that the State had agreed that J.M.P. Jr. did not have a criminal history. And, on appeal, the State again concedes there was no evidence that J.M.P. Jr. has a criminal history.

Fourth, we analyze the evidence concerning J.M.P. Jr.'s reputation. *See* HEALTH & SAFETY § 574.088(b)(4). J.M.P. Sr. described J.M.P. Jr. as "a great model for his kids," "active in everything," "a successful businessman," a "wonderful individual," and "a safe person who cares about people." Ultimately, J.M.P. Sr. stated that he trusted his son with his life and believed J.M.P. Jr. to be "the safest person that I have ever seen with a firearm."

J.M.P. Jr. testified about his life in the decades following the temporary, involuntary commitment, including that he had finished college, had a productive career, was married with children, and active in his church and the community.

The trial court also admitted two letters attesting to J.M.P. Jr.'s good reputation. One letter was authored by a close friend who had known J.M.P. Jr. since elementary school. The letter noted J.M.P. Jr.'s involvement in church and multiple local charities, and described him as a loving husband and father, a successful businessman, and an upstanding member of the community. The second letter described J.M.P. Jr. as a friend who had become like a member of the author's extended family to whom he had entrusted the care of his children, and he praised J.M.P. Jr.'s positive attitude and his "solid character." On appeal, the State concedes this was the only reputation evidence admitted at trial. The State did not controvert J.M.P. Jr.'s reputation evidence.

### 3. Trial Court's Credibility Determinations

The State argues that the trial court impliedly found the witnesses and documentary evidence were not credible and argues that there were many inconsistencies and credibility issues with the witnesses and evidence submitted by J.M.P. Jr. With respect to the credibility of J.M.P. Jr. and his witnesses, the State maintains the following contradictions create credibility issues:

- Although J.M.P. Sr. had been an OB/GYN for fifteen years at the time of his application to involuntarily commit J.M.P. Jr., he claimed that he had no training in evaluating a person's mental state.

–25–

- Although J.M.P. Sr. swore under oath in 1992 that J.M.P. Jr. was mentally ill and likely to cause serious harm to himself, J.M.P. Sr. testified that friends suggested he have J.M.P. Jr. evaluated, he had no concern J.M.P. Jr. would harm himself or others, he never saw any evidence that J.M.P. Jr. was violent toward anyone, and his main concern was to determine if J.M.P. Jr. was depressed.[12]

Both of these "contradictions" relate to § 574.088(b)(1) of the TMHC, the circumstances that led to the involuntary commitment. If there are conflicts in the testimony, we must presume the fact-finder resolved them in favor of the ruling if reasonable human beings could do so. *See Jackson*, 221 S.W.3d at 653. However, these alleged contradictions identified by the State do not affect the result. Whether or not an OB/GYN in 1992 was trained in evaluating a person's mental state is not relevant or dispositive to the trial court's statutory findings under § 574.088. Also, even if his father filed a boilerplate petition that alleged that J.M.P. Jr. was likely to harm himself or others, the 1992 trial court did not find that J.M.P. Jr. was a danger to others. Resolving these conflicts in favor of the judgment—that J.M.P. Jr. did meet the criteria for commitment in 1992—does not resolve the issue to be determined under § 574.088 of the TMHC: whether any such past concerns have been alleviated. Ultimately, the purpose of the firearm disability relief program is to evaluate whether the past concerns that led to an involuntary commitment are *currently* present.

---

[12] The State also points to other documents associated with the 1992 involuntary commitment, but we have already determined that the factual statements in those documents do not constitute evidence in this case.

–26–

The record contains uncontroverted evidence concerning J.M.P. Jr.'s good mental health following his involuntary commitment as a minor, his lack of a criminal history, and his good reputation. *See* HEALTH & SAFETY § 574.088(b)(2)–(4). Further, the State concedes that there was no evidence of J.M.P. Jr. requiring any mental-health treatment after his involuntary commitment in 1992, that there was no evidence that J.M.P. Jr. has a criminal history, and that the only reputation evidence was J.M.P. Jr.'s. *See* HEALTH & SAFETY § 574.088(b)(2)–(4).

A fact-finder's decisions regarding credibility must be reasonable. *City of Keller*, 168 S.W.3d at 820. A fact-finder cannot ignore undisputed testimony that is clear, positive, direct, otherwise credible, free from contradictions and inconsistencies, and could have been readily controverted. *Id.* Based on the record in this case, we cannot ignore the lack of evidence supporting any implied credibility findings and the conclusive evidence that rebuts those findings.

## 4. Removing J.M.P. Jr.'s Firearms Disability Is in the Public Interest

The State maintains that J.M.P. Jr. was required to prove both that (1) he was no longer likely to act in a manner dangerous to public safety, *and* (2) that removing his disability to purchase a firearm is in the public interest. *See* HEALTH & SAFETY § 574.088(c). The State contends that J.M.P Jr. admitted evidence only of his personal reasons for wanting his firearms disability removed—that he hunts and wants to teach his son to hunt—which do not address the public interest.

Before the trial court could grant J.M.P. Jr.'s petition, the trial court was required to find (1) J.M.P. Jr. is no longer likely to act in a manner dangerous to public safety, and (2) removing J.M.P. Jr.'s disability to purchase a firearm is in the public interest. *See id.* In determining whether to make those findings and grant J.M.P. Jr. relief, the trial court was required to hear and consider the following four categories of evidence:

(1) the circumstances that led to imposition of J.M.P. Jr.'s firearms disability under 18 U.S.C. § 922(g)(4);

(2) J.M.P. Jr.'s mental history;

(3) J.M.P. Jr.'s criminal history; and

(4) J.M.P. Jr.'s reputation.

*See* HEALTH & SAFETY § 574.088(b). The statute requires the trial court to consider those four categories in determining whether to find that a petitioner is dangerous and whether to find that relief from the disability is in the public interest. For example, if a petitioner were impaired by ongoing mental illness or had a dangerous criminal history, then evidence under (b)(2) or (b)(3) would support a finding that removal of the firearms disability would not be in the public interest. Even if a petitioner had problematic behavior that had not risen to the level of an adjudication, such evidence under (b)(4) could support a finding that removal of the disability would not be in the public interest.

However, as previously outlined in this opinion, J.M.P. Jr. presented positive evidence related to each of these four statutory factors, which was uncontroverted

–28–

by the State. The State admitted no evidence relating to any of the four statutory factors that would contradict a finding that removing the disability is in the public interest. If the trial court's decisions were founded in the law, rather than the personal opinions of the judicial officer, the trial court could reasonably reach only one decision.

Further, the public policy underlying the TMHC is "to provide to each person having severe mental illness access to humane care and treatment." HEALTH & SAFETY § 571.002. We must be mindful that, as a matter of public policy and safety, we do not want to discourage parents from seeking mental health care for their minor children by overreading statutes to create permanent, life-long disabilities that cannot be removed. In a situation, like here, where:

- a father sought to have his minor son's mental health evaluated,

- his minor son was involuntarily committed but then discharged without the need for medication or further treatment, and then,

- thirty years later, despite a clean bill of health and being an upstanding and productive member of society, his adult son finds himself unable to exercise his constitutional liberty to possess a firearm,

these long-term consequences could cause other parents to hesitate or refrain from seeking help for their minor children. Rather, as a matter of public interest, public policy should encourage parents to err on the side of caution and seek mental health evaluation and treatment for their children when they have concerns.

–29–

It was undisputed that J.M.P. Jr. had owned firearms virtually his whole life and he had not had any mental health treatment or trouble with the law in the thirty years since his temporary, involuntary commitment in 1992. And, again, the licensed professional counselor stated that after evaluating J.M.P. Jr., she found no cause for concern with the prospect of his firearm rights being restored. She testified that he presented as high-functioning with no traces of depression or deception and he had a record of safety and stability without any red flags over the last thirty years. The licensed professional counselor's written evaluation reiterating her belief that J.M.P. Jr. posed no danger was admitted into evidence. There has never been a finding that J.M.P. Jr. has been a danger to others, meaning the public.[13] There is no evidence from which the trial court could conclude that granting J.M.P. Jr.'s petition would be anything other than in the public interest.

## 5. The Trial Court Abused Its Discretion and the Evidence Was Legally Sufficient

Accordingly, we conclude that J.M.P. Jr. conclusively established, as a matter of law, all vital facts in support of his petition. As a result, the trial court abused its discretion because it failed to correctly analyze and apply the law and, based on the conclusive evidence, it could have reached only one decision but failed to do so.

---

[13] Although not in evidence, even if we were to consider the judicially-noticed medical reports and other documents related to J.M.P. Jr.'s 1992 involuntary commitment, we note that those documents stated that J.M.P. Jr. was not a danger to others.

There has never been any evidence or finding that J.M.P. Jr. was likely to act in a manner dangerous to public safety; rather, the original 1992 order contains a findings that J.M.P. Jr. was not a danger to others. There was no evidence that removing J.M.P. Jr.'s disability to purchase a firearm was not in the public interest, and there was uncontroverted positive evidence of each factor listed in the statute showing that removing his disability would be in the public interest. Based on the evidence admitted at trial, the trial court could reasonably only reach one decision in making the findings described by § 574.088(c) of the TMHC and granting relief under the statute, and it failed to do so.

The first part of issue one is decided in favor of J.M.P. Jr. Based on our resolution of this issue, we need not address the second part of issue one or issue two.

## III. Conclusion

The trial court acted arbitrarily and unreasonably, and it abused its discretion when it denied J.M.P. Jr.'s petition to remove his firearms disability. We conclude the evidence conclusively established that J.M.P. Jr. is not likely to act in a manner dangerous to public safety and that removing J.M.P. Jr.'s disability to purchase a firearm is in the public interest. We reverse the trial court's order and render an order that:

(1) states that, under HEALTH & SAFETY § 574.088(a), J.M.P. Jr. qualifies for relief from a firearms disability;

(2) declares that J.M.P. Jr. is not a prohibited person under 18 U.S.C. § 922(g)(4); and

(3) restores J.M.P. Jr.'s right to ship, transport, possess, or receive firearms and ammunition.

220878f.p05
Miskel, J., concurring
Partida-Kipness, J., dissenting

/Emily A. Miskel/
EMILY A. MISKEL
JUSTICE



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

IN RE THE STATE OF TEXAS
FOR THE BEST INTERESTAND
PROTECTION OF J.M.P. JR.,

No. 05-22-00878-CV

On Appeal from the Probate Court
No. 3, Dallas County, Texas
Trial Court Cause No. MI-92-1623.
Opinion delivered by Justice Miskel.
Justices Partida-Kipness and Reichek
participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **REVERSED** and judgment is **RENDERED** that:

(1)  states that, under HEALTH & SAFETY § 574.088(a), J.M.P. Jr. qualifies for relief from a firearms disability;

(2)  declares that J.M.P. Jr. is not a prohibited person under 18 U.S.C. § 922(g)(4); and

(3)  restores J.M.P. Jr.'s right to ship, transport, possess, or receive firearms and ammunition.

It is **ORDERED** that appellant J.M.P. JR. recover his costs of this appeal from appellee THE STATE OF TEXAS.

Judgment entered this 19th day of March, 2024.